IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JGC Holdings Corporation,

        *Petitioner*,

v.

Kingdom of Spain,

        *Respondent*.

Civil Action No. 1:23-cv-02701

**DECLARATION OF LEO FLYNN**

I, Leo Flynn, declare:

1. I am the Principal Legal Adviser of the Legal Service for the AIDE (State aid) team of the European Commission and I am authorized by the European Commission to make this declaration.

2. I make this declaration based on my own knowledge and belief. Where the facts in this declaration are not within my knowledge, the grounds for my belief are set out in the declaration.

**Background**

3. I joined the AIDE team in September 2008. From February 2016 until May 2020 I was part of other teams in the Legal Service. I re-joined the AIDE team as of June 1, 2020 and became its Principal Legal Adviser as of December 1, 2021.

4. The Legal Service provides legal advice to the European Commission, including its Directorate General for Competition, on its decisions on State aid. The European Commission is an institution of the European Union (the "Union") and acts on behalf of the Union as its external representative.

5. I have been a member of the Legal Service of the European Commission since 2002. Prior to joining the Commission, I was a Legal Secretary at the Court of Justice of the European Union for five years. I graduated from the National University of Ireland (University College, Cork) and Cambridge University.

6. I appear regularly before the Union courts, having appeared for the Commission in over 250 cases on State aid to date (and in excess of 450 cases, overall). I also lecture at King's College, London, currently as a visiting Professor at its Centre for European Law. In 2022, I received an honorary doctorate from Lund University (Sweden) for my work relating to State aid law.

**State Aid Rules in the European Union**

7. The EU is founded on two treaties: the Treaty on European Union (TEU) and the Treaty on the Functioning of the European Union (TFEU). One object of the TFEU is to establish a properly functioning "internal market." The internal market is "an area without internal frontiers in which the free movement of goods, persons, services and capital is ensured" within the European Union (TFEU, Article 26).

8. Article 107(1) of the TFEU is concerned with the effect of State aid on the internal market, and states:

> Save as otherwise provided in the Treaties, any aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods shall, in so far as it affects trade between Member States, be incompatible with the internal market.

9. Article 107(2) of the TFEU provides a list of State aid that is compatible with the internal market and Article 107(3) provides a list of State aid that may be compatible, depending on the circumstances.

2

10. The determination that aid granted by a Member State is State aid within the meaning of Article 107 of the TFEU does not depend on whether the aid is granted to a national of a Member State of the Union or not. The critical inquiry is whether the aid granted by the Member State "distorts or threatens to distort competition" within the internal market of the Union "by favouring certain undertakings or the production of certain goods." (TFEU, Article 107(1)).

11. To avoid the competition distortions from State aid, Article 108 of the TFEU prescribes a process for examining State aid and preventing State aid that is "incompatible with the internal market" within the meaning of Article 107(1) of the TFEU, as explained below.

**The European Commission's Role in Applying the State Aid Rules**

12. Article 108(2) of the TFEU gives the European Commission exclusive authority, subject to review only by the Union courts, to decide if a Member State has granted aid falling within Article 107(1) of the TFEU and "that the State concerned shall abolish or alter such aid":

> If, after giving notice to the parties concerned to submit their comments, the Commission finds that aid granted by a State or through State resources is not compatible with the internal market having regard to Article 107, or that such aid is being misused, it shall decide that the State concerned shall abolish or alter such aid within a period of time to be determined by the Commission.

13. Article 108(3) of the TFEU requires Member States to notify the European Commission "in sufficient time to enable it to submit its comments, of any plans to grant or alter aid." Such comments by the European Commission are based on the material submitted by the Member State with the notification.

14. If, based on this preliminary review, the European Commission "considers that any such plan is not compatible with the internal market having regard to Article 107," then the European Commission initiates the investigation required by Article 108(2) of the TFEU. This

3

investigation includes a review of all submissions made by interested parties, including investors and other Member States.

15. Within the European Commission, the Directorate-General for Competition drafts both preliminary and final State aid decisions, with input from the AIDE team of the Legal Service (for which I am Principal Legal Adviser, as noted above).

16. The central role of the European Commission regarding the application of the State aid rules is reinforced by Article 29 of Regulation (EU) 2015/1589 (a true and correct copy of which is attached here to as Exhibit 1), which authorizes the European Commission to intervene in Member States' domestic courts that are considering those rules:

> Where the coherent application of Article 107(1) or Article 108 TFEU so requires, the Commission, acting on its own initiative, may submit written observations to the courts of the Member States that are responsible for applying the State aid rules.

17. This Article arose from Council Regulation (EU) No. 734/2013 of 22 July 2013 (a true and correct copy of which is attached here to as Exhibit 2), which explained its purpose at paragraph 18:

> Consistency in the application of the State aid rules requires that arrangements be established for cooperation between the courts of the Member States and the Commission. Such cooperation is relevant for all courts of the Member States that apply Article 107(1) and Article 108 of the TFEU. In particular, national courts should be able to ask the Commission for information or for its opinion on points concerning the application of State aid rules. The Commission should also be able to submit written or oral observations to courts which are called upon to apply Article 107(1) or Article 108 of the TFEU. When assisting national courts in this respect, the Commission should act in accordance with its duty to defend the public interest.

18. When the European Commission does intervene before the courts of Member States or courts of third countries, it is represented by the Legal Service.

4

**The European Commission's Preliminary Decision that an ECT Award on the Modification of Spain's Electricity Regime is State Aid**

19.     On 22 December 2014, Spain notified the European Commission under Article 108(3) of the TFEU of its regime to support electricity generation from renewable energy sources.

20.     In considering the compatibility of Spain's renewable energy regime with Article 107 of the TFEU, the European Commission found that, in "an extra-EU situation," *i.e.*, a case involving a claim by an investor from outside the Union, there could be no breach of the fair and equitable treatment provision of the Energy Charter Treaty (ECT) based on modifications to Spain's renewable energy regime because non-EU investors , like EU investors, could not have "a legitimate expectation stemming from illegal State aid." (Decision C(2017) 7384 of 10 November 2017, ¶ 164, a true and correct copy of which is attached here to as Exhibit 3).

21.     The European Commission considered the effect of awards by arbitral tribunals finding that Spain's modification of the regime breached the ECT. The European Commission stated at paragraph 165 of Decision C(2017) 7384 of 10 November 2017 that "any compensation which an Arbitration Tribunal were to grant to an investor *on the basis that Spain has modified the . . . scheme . . .* would constitute in and of itself State aid." Since "Arbitration Tribunals are not competent to authorise the granting of State aid," as "that is an exclusive competence of the Commission," if the Tribunals "award compensation . . . or were to do so in the future, this compensation would be notifiable State aid pursuant to Article 108(3) TFEU and be subject to the standstill obligation."

22.     Spain notified the European Commission on April 17, 2019 of the award in *Antin Infrastructure Services Luxembourg SARL and Antin Energia Termosolar BV v Kingdom of Spain*, ICSID Case No. ARB/13/31 of 15 June 2018 ("*Antin*"), finding that Spain's modification of its

5

regime to support electricity generation from renewable energy sources breached the ECT and awarding compensation.

23. After its initial review, the European Commission opened an investigation on July 19, 2021, pursuant to Article 108(2) of the TFEU.

24. On November 5, 2021, the European Commission invited submissions from interested parties on its decision to initiate the procedure laid down in Article 108(2) of the TFUE (the "Preliminary Decision") to enable it to undertake the investigation required by Article 108(2) of the TFEU and reach a final decision. (Invitation to Submit Comments of 5 November 2021 (State aid SA.54155 (2021/NN) — Arbitration award to Antin), which reproduced the Preliminary Decision, a true and correct copy of which is attached hereto as Exhibit 4). In the Preliminary Decision at paragraphs 76-87, the European Commission analyzed whether Spain's prior renewable energy regime (the "2007 scheme") constituted unlawful State aid, and concluded that "this is the case." On that basis, at paragraph 88, the European Commission concluded, "at this stage, that the notified award to Antin constitutes aid because it has the effect of compensating for the withdrawal of unlawful aid, i.e. of the 2007 scheme."

**The European Commission's Initial Review of the JGC Award as State Aid**

25. In addition to the *Antin* award, Spain has notified the European Commission under Article 108(3) of the TFEU of each of the ECT arbitration awards addressing the modification of Spain's renewable energy regime, including the award rendered on March 25, 2022, in the arbitration underlying this case, *JGC Holdings Corp. v. Kingdom of Spain*, ICSID Case No. ARB/15/27 (case number at the European Commission SA.102404).

26. Consistent with the process regarding the *Antin* award, described above, the European Commission is undertaking a preliminary examination of whether these awards are illegal State aid and whether investigation under Article 108(2) of the TFEU is required. Once the

6

Directorate-General for Competition prepares draft decisions resulting from these investigations, the Legal Service will be consulted and will provide a formal opinion on the drafts, consistent with the practice that I described above.

**Consequences of the Current Initial Review**

27. Article 108(3) of the TFEU states that "[t]he Member State concerned shall not put its proposed measures into effect until this [State aid investigation] procedure has resulted in a final decision." Thus, Spain's payment of the JGC award would breach Article 108(3) of the TFEU unless and until the European Commission decides that the award is compatible with the internal market.

28. If Spain pays the award before any decision of the Commission, the Commission can issue a suspension and recovery injunction and bring Spain directly to the Court of Justice of the European Union for violation of Union law. In addition, Spain has the obligation to recover aid that it has already granted, as explained further below.

**Consequences of a Final European Commission Decision on the JGC Award**

29. If the European Commission ultimately decides that the JGC award falls within Article 107(1) of the TFEU and constitute incompatible State aid, then that decision will bind Spain under Article 288 of the TFEU: "A decision shall be binding in its entirety." Any payment by Spain of the JGC award would breach that Article and the European Commission could commence proceedings before the Court of Justice of the European Union seeking a declaration that there has been an infringement by Spain of Union law, which can ultimately lead to the imposition of a lump sum and periodic fines to be paid by Spain until it complies with the corresponding Court judgment declaring that Spain has violated Union law.

30. By way of example, by judgment of 20 January 2022 in Case C-51/20 *Commission v Greece* (a true and correct copy of which is attached here to as Exhibit 5), the Court ruled that

7

Greece had failed to comply with an earlier Court judgment of 2017 that had found Greece in breach of a Commission decision ordering that Member State to recover incompatible and unlawful aid previously granted to Larco General Mining & Metallurgical Company S.A. In its judgment, the Court ordered Greece to make a lump sum payment of €5.5 million and a periodic penalty payment of €4.368 million every six months from the date of the ruling until full compliance with the 2017 ruling, that is, recovery of the totality of the aid paid to Larco General Mining & Metallurgical Company SA.

31. The European Commission would be required to order Spain to recover any payments made on the JGC award "unless that would be contrary to a general principle of European Union law." (Commission Notice on the recovery of unlawful and incompatible State aid, 2019 O.J. C 247/2, 23 July 2019, ¶ 17, a true and correct copy of which is attached here to as Exhibit 6). While these principles inspire the whole European Union legal framework, in the context of State aid recovery policy, they are subject to a restrictive interpretation. I am not aware of any such general principle that would apply affecting the usual obligation of the Member State to recover incompatible aid it had previously paid to the beneficiary.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 9, 2024
Brussels, Belgium

_____
Leo Flynn

9

Electronically signed on 09/02/2024 18:37 (UTC+01) in accordance with Article 11 of Commission Decision (EU) 2021/2121